Filed 03/26/25

| | | |
|---|---|---|
| **VERMONT SUPERIOR COURT**<br>Washington Unit<br>65 State Street<br>Montpelier VT 05602<br>802-828-2091<br>www.vermontjudiciary.org |  | **CIVIL DIVISION**<br>Case No. 24-CV-00189 |

---

Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

---

## Opinion and Order

In June 2022, the Legislature adopted Act 159 ("An act relating to best management practices for trapping") and Act 165 ("An act relating to hunting coyotes with dogs"). The Acts required the Fish and Wildlife Board (the Board) to revise its trapping rules and adopt rules regulating hunting coyotes with dogs for the first time. The Board responded by promulgating an amended Furbearing Species Rule (the Rule), 10 V.S.A. app. § 44, Code of Vt. Rules 12 010 073, available at https://tinyurl.com/47nw6arc. The plaintiffs in this case consist of four nonprofit organizations—Protect Our Wildlife, Animal Wellness Action, Center for a Humane Economy, and Vermont Wildlife Coalition—who jointly challenge the validity of various components of the Rule as contrary to legislative intent or arbitrary (and on one issue for lack of any relevant rulemaking authority). Plaintiffs seek a declaration in that regard, an order reinstating a moratorium on hunting coyotes with dogs, *see* 2021, No. 165 (Adj. Sess.), § 2, and any other injunctive relief that may be warranted. Defendants Christopher Herrick, in his official capacity as the Commissioner of the Department of Fish and Wildlife, the Department of Fish and Wildlife (the Department), and the Board jointly argue that the

Rule is valid as adopted, and that Plaintiffs lack constitutional standing to assert invalidity as to one point of contention.

I.    Background

Act 159, as relevant here, required the Department to recommend "best management practices (BMPs) for trapping that propose criteria and equipment designed to modernize trapping and improve the welfare of animals subject to trapping programs." 2021, No. 159 (Adj. Sess.), § 1(a).  The Board was instructed to revise its trapping rules to be "at least as stringent" as the BMPs recommended by the Department.  *Id.* § 2 (adding 10 V.S.A. § 4861(b)).

Act 165, as relevant here, adopted 10 V.S.A. §§ 5008, 5009.  2021, No. 165 (Adj. Sess.), § 1.  These statutes require a permit from the Department to hunt coyotes with dogs, bars such hunters from releasing dogs on land posted pursuant to 10 V.S.A. § 5201 or on property for which law enforcement has advised that such hunting is not permitted, and establishes penalties for violations.  Section 2 of the Act established a moratorium on hunting coyotes with dogs until the Board adopted rules pursuant to Section 3, which sets out the requirements for that rulemaking.  The general purpose of the rulemaking is to "reduce conflicts between landowners and persons pursuing coyote with the aid of dogs" while preserving "the humane taking of coyote, the management of the population in concert with sound ecological principles, and the development of reasonable and effective means of control."  *Id.* § 3(a).

In response to both Acts, the Board adopted the Rule over the objection of the Legislative Committee on Administrative Rules (LCAR), and the Department lifted the

moratorium on hunting coyotes with dogs.  The consequence of LCAR's formal objection

to the Rule is discussed below.

Plaintiffs claim that the Rule is invalid for the following reasons:

(1)     The definition of "control" of dogs and related requirements are contrary to

legislative intent insofar as they do not require enough control over dogs during hunting

or training.  They also are arbitrary insofar as they fail to improve the pre-Rule status

quo and do not include more or better restrictions on dog behavior.

(2)     The definition of "public trail" (from which a safe distance for traps may be

measured) is contrary to legislative intent and arbitrary insofar as it includes irrational

limitations on the meaning of the expression and deviates from reasonable expectations

among members of the public as to what a public trail is.

(3)     It contains an exemption for traps in water or under ice from the "safe

distance" away from certain locations where traps may be placed is contrary to legislative

intent and is arbitrary insofar as the record is devoid of evidence supporting the

exemption and water attracts recreating people and pets.[1]

(4)     It purports to define "trapping" to be a form of "hunting," which might have

constitutional repercussions at some point in the future, is contrary to legislative intent

because it changes the definition in Act 159, and it is arbitrary because there is no

meaningful rationale offered in support of it.

---

[1] Plaintiffs asserted another challenge to the setback for traps in their "complaint" to the effect that the size of the general setback on its face is not a safe distance, but they later withdrew that challenge.

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

(5)     The BMPs for body gripping traps are arbitrary because they are based on flawed research, and the Board should have considered limiting or banning certain types of traps and regulating them on a species-by-species basis.

The Court denied Plaintiffs' motion for a temporary restraining order and a subsequent motion for preliminary injunction. *See* Opinion and Order on Plaintiffs' Motion for a Temporary Restraining Order (filed January 18, 2024), *available at* 2024 WL 1492589, and Opinion and Order on Plaintiffs' Motion for Preliminary Injunction at 18 (filed Feb. 22, 2024), *available at* 2024 WL 1492588.  The parties have fully briefed the issues, and a hearing was held on February 25, 2025.

II.     Standards

A challenge to the validity of an administrative rulemaking is subject to record review.  *See State Dep't of Taxes v. Tri-State Indus. Laundries, Inc.*, 138 Vt. 292, 294 (1980); *see also* 3 V.S.A. § 807 (declaratory judgment on validity or applicability of rules).  The applicable procedural rule is Vt. R. Civ. P. 74.  *See Conservation Law Found. v. Burke*, 162 Vt. 115, 125 (1993).  Typically, the burden would fall to the challenger to demonstrate invalidity.  *See Hatin v. Philbrook*, 134 Vt. 456, 458 (1976).  "Rules are 'prima facie evidence of the proper interpretation' of the enabling legislation.  They enjoy a presumption of validity and are valid if they are reasonably related to the purposes of the enabling act.  Further, 'absent compelling indication of error,' we accept the construction of a statute made by the administrative agency responsible for its implementation."  *Miller v. IBM*, 163 Vt. 396, 399 (1995) (citations omitted).

A.    Effect of LCAR's Objection, Generally

These standards are complicated in this case by LCAR's certified objection to the final version of the Rule.  *See* 3 V.S.A. § 817 (LCAR).  Part of the rule promulgation process includes presenting the final version of a proposed rule to LCAR, which can recommend withdrawal or amendment.  3 V.S.A. § 842(a).  Potential bases for objection include:

> (1) a proposed rule is beyond the authority of the agency;
> (2) a proposed rule is contrary to the intent of the Legislature;
> (3) a proposed rule is arbitrary;
> (4) the agency did not adhere to the strategy for maximizing public input prescribed by the Interagency Committee on Administrative Rules;
> (5) a proposed rule is not written in a satisfactory style in accordance with section 833 of this title;
> (6) the economic impact analysis fails to recognize a substantial economic impact of the proposed rule, fails to include an evaluation and statement of costs to local school districts required under section 838 of this title, or fails to recognize a substantial economic impact of the rule to such districts; or
> (7) the environmental impact analysis fails to recognize a substantial environmental impact of the proposed rule.

3 V.S.A. § 842(b).  Ultimately, if LCAR is dissatisfied with the result, it can certify its objection to the Secretary of State.  3 V.S.A. § 842(c)(1).

A certified objection does not prevent a rule from taking effect, but it is not without consequence.  Section 842(c)(2) provides:

> [T]o the extent that the objection covers a rule or portion of a rule, the burden of proof thereafter shall be on the agency in any action for judicial review or for enforcement of the rule to establish that the part objected to is within the authority delegated to the agency, is consistent with the intent of the Legislature, is not arbitrary, and is written in a satisfactory style in accordance with section 833 of this title, and that the agency did adhere to the strategy for maximizing public input prescribed by the Interagency Committee on Administrative Rules and its economic and environmental impact analyses did not fail to recognize a substantial economic or environmental impact.  The objection of the Committee shall not be admissible evidence in any proceeding other than to establish the fact of the

objection. If the agency fails to meet its burden of proof, the court shall declare the whole or portion of the rule objected to invalid.

In its decision denying a preliminary injunction, the Court held that this provision, to the extent applicable, removes the presumption of validity and switches the burden to the State to prove validity, but it does not create a presumption of invalidity. Opinion and Order on Motion for Preliminary Injunction at 6 (filed Feb. 22, 2024). The Court also held that it applies, as the plain text says, only "to the extent" of the objection. *See id.* Thus, if the certified objection is limited to one basis—*e.g.,* provision X is contrary to the intent of the Legislature—then the presumption of validity disappears, and the burden is on the State to prove that X is not contrary to the intent of the Legislature. A challenge to X on other grounds, such as whether X was written in a satisfactory style, remains subject to the ordinary presumption of validity, and the burden is on the challenger to establish invalidity if such a matter is contested.

Plaintiffs argue that the Court's latter holding is incorrect, and a better reading of § 842 is that, if LCAR certifies any objection whatsoever to a particular provision of a rule, then the State must affirmatively prove validity on all grounds listed in § 842(c)(2), including all grounds that were not cited as a basis for LCAR's objection. The Court, however, continues to see no basis for such a construction of § 842 in its text and discerns no good purpose for such a reading either. If LCAR voices one ground of objection but not another, there is no reason to remove the traditional presumption of validity and impose a burden of proving validity on the State as to the unobjected-to ground. Doing so would be tantamount to using § 842(c) to create a presumption of invalidity even though § 842(c) only applies "to the extent" of the objection and only

switches the burden from one party to another. The Court declines to revise the preliminary injunction decision on this point.

The objections certified by LCAR to the Secretary of State are as follows:

–the objection to Sec. 3.20, the definition of trapping, on the ground that it is contrary to the intent of the General Assembly, including the intent of 2022 Acts and Resolves No. 159, Sec. 1(d), to add the word hunt to the definition;

–the objection to Sec. 3.14(b), a portion of the definition of public trail, on the ground that this portion of the definition is contrary to the intent of the General Assembly, including the intent of 2022 Acts and Resolves No. 159, Sec. 1(a)(4), to include all trails where persons may reasonably be expected to recreate;

–the objection to Sec. 4.15, trapping setbacks, that excepts from the setback requirements traps set in the water or under ice on the ground that it is contrary to the intent of the General Assembly, including the intent of 2022 Acts and Resolves No. 159, Sec. 1(a)(4), to exempt traps set in the water or under ice from setback requirements; and[2]

–the objection to Secs. 3.6, definition of control of dog(s), and 4.20, taking coyote with the aid of dogs, on the ground that it is contrary to the intent of the General Assembly, including the intent of 2022 Acts and Resolves No. 165, Sec. 3(b)(4), to allow the taking of coyote with aid of dogs unless there is a required means of controlling dogs that sufficiently minimizes the risk that dogs pursuing coyote will enter onto land that is posted against hunting; enter onto land where pursuit of coyote with dogs is not authorized; harass or harm people or domestic animals; and cause other unintentional damages to people or property.

Letter from LCAR to Secretary of State Sarah Copeland Hanzas (Dec. 14, 2023). All objections are that the cited provisions are contrary to the intent of the Legislature. No other ground of invalidity is asserted.

---

[2] So in original. LCAR presumably meant "the intent of 2022 Acts and Resolves No. 159, Sec. 1(a)(4), [not] to exempt traps set in the water or under ice from setback requirements."

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

Accordingly, to the extent that Plaintiffs challenge the cited provisions as being contrary to the intent of the Legislature, there is no presumption of validity, and the State has the burden of proving that these provisions are not contrary to the intent of the Legislature. To the extent that Plaintiffs challenge the cited provisions as arbitrary or on some other basis, the provisions are presumed to be correct, valid, and reasonable, and the burden of proving otherwise is on Plaintiffs.

Plaintiffs also argue that, to the extent the burden is on the State, the State must make a clear and convincing showing of validity. Plaintiffs cite exclusively to *In re Johnston*, 145 Vt. 318 (1985), in support of that contention. In that case, the Court said,

> In appeals from the actions of administrative agencies we have applied a deferential standard of review *to claims of insufficiency of evidence.* Absent a clear and convincing showing to the contrary, decisions made within the expertise of such agencies are presumed correct, valid and reasonable. The revocation decision here was clearly within the Board's area of expertise. We hold that licensee has failed to make *the clear and convincing showing necessary to overcome the presumption of validity.* Our review is limited to whether, on the record developed before the Board, there is any reasonable basis for the Board's actions.

*Id.* at 321–22 (citations omitted, emphasis added). As described in *Johnston*, clear and convincing is the showing necessary to overcome the presumption of validity that attaches to a decision made within the agency's area of expertise. That deference is afforded due to the Court's recognition of such expertise in light the powers delegated to the agency. The Court sees no basis to impose a counter-presumption, a presumption of invalidity, from an LCAR objection; and neither the language of the law nor the logic of *In re Johnston* support such a result. The "sanction" imposed by law following an LCAR objection is that the State will bear the burden of proof to justify the rule as regards the basis for the objection. No more is required.

## B. Effect of LCAR's Objection on Deference

Relatedly, Plaintiffs argue that the Court should give the Board's interpretations of applicable statutes no deference and, instead, should interpret those statutes *de novo*. The State argues, on the other hand, that the deference ordinarily given agency interpretations of a governing statute remains intact because, while 3 V.S.A. § 842(c) switches the burden to prove validity to the State, it says nothing about eliminating the traditional deference given to agency interpretations.

Plaintiffs have the better of the argument. If the Court were to defer to the Board's interpretation of relevant statutes, there would be little left of the State's burden to prove that the Rule is valid. The only palpable way of accommodating the switched burden under § 842(c) when considering issues of legislative intent is if the Court interprets those statutes *de novo*.

## C. Statutory Interpretation, Generally

As to statutory interpretation: "Our primary objective when construing a statute 'is to give effect to the intention of the Legislature.' In effectuating that intent, '[w]e examine the plain language of the statute, and if this language is clear and unambiguous, we enforce the statute according to its terms.'" *Maple Run Unified Sch. Dist. v. Vermont Hum. Rts. Comm'n*, 2023 VT 63, ¶ 13 (citations omitted). To properly interpret a statute, the Court "will not excerpt a phrase and follow what purports to be its literal reading without considering the provision as a whole, and proper construction requires the examination of the whole and every part of the statute." *TD Banknorth, N.A. v. Dep't of Taxes*, 2008 VT 120, ¶ 15, 185 Vt. 45, 53 (citation omitted); *see also Ran-Mar, Inc. v. Town of Berlin*, 2006 VT 117, ¶ 5, 181 Vt. 26, 29 ("We construe all parts of

the statutory scheme together, where possible, as a harmonious whole, and '[w]e will avoid a construction that would render the legislation ineffective or irrational.'" (citations omitted)).

### D. Act 159 Challenges vis-à-vis LCAR's Objection

The unusual structure of Act 159 further complicates matters in relation to LCAR's objection. Specifically, the responsibilities of the Board and the Department are distinct. As explained above, Section 1 of Act 159 tasked the Department with proposing BMPs for trapping and provided some subject areas to be addressed and certain standards for those recommendations. The Department was directed to "provide an opportunity for public review and comment and shall hold at least one public hearing." The Department then was to report those recommendations to the "Senate Committee on Natural Resources and Energy, the House Committee on Natural Resources, Fish, and Wildlife, and the Fish and Wildlife Board." The Department was *not* instructed to adopt any rules based on those recommendations or to do anything else with them.

Instead, Section 2 directed the Board to revise its trapping rules in light of the Department's recommendations. The sole statutory constraint on how the Board might do so is this: "The revised rules shall be at least as stringent as best management practices for trapping recommended by the Department of Fish and Wildlife to the General Assembly."

If a person were disappointed with a recommendation by the Department, she surely would be disappointed if the same recommendation was directly incorporated into the Rule. Yet the Rule, on that point, necessarily would be "as stringent as" the recommendation and so would be fully consistent with legislative intent. As a result,

when looking at the Rule, the question as to whether the Board complied with legislative intent is whether the Rule is "at least as stringent" as the Department's recommendations, not whether the Rule meets some other standard that someone thinks *the Department's* recommendations should have met. Act 159 is not ambiguous in this regard.

This is not remotely how either side has approached the matter of legislative intent, however. Rather, both side shave collapsed the distinction between the Department and the Board, ignored the bifurcation of responsibilities in Act 159, and have applied the perceived intent behind Section 1 as though it applies directly to the Board's Section 2 undertaking–without any analysis of whether the Rule is at least as stringent as the Department's recommendations. Such an approach is not consistent with the statute and effectively nullifies the Board's express Section 2 mandate to adopt a rule "as stringent as" the Section 1 recommendations.[3]

This raises some uncertainty as to how the Court should approach the briefing on questions of legislative intent addressing those parts of the Rule falling under Act 159 and objected to by LCAR. The State has the burden of proving consistency with legislative intent on such matters, yet both sides have overlooked the plain language of Section 2. The Court concludes that, while the burden of persuasion is on the State on such issues, and thus it is the party with the ultimate responsibility to show that the Rule is as stringent as the recommendations, Plaintiffs (at least) had the burden of raising the stringency question if they viewed that as a failing of the rule. Their failure

---

[3] The substance of LCAR's objection indicates that it likely did as well.

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

to do so, in the Court's view, operates as a waiver of any claim that the rule fails the stringency metric. As that is the only intent the Court can glean from the Act 159, there is no evidence suggesting that the rule fails to meet that intent. To conclude otherwise would turn the switched burden into a presumption of invalidity.

Accordingly, considering the plain language of Section 2, the Rule necessarily is consistent with legislative intent. Nevertheless, and in the alternative, because both sides address larger issues of perceived legislative intent disconnected from the language of Section 2, the Court will also address those arguments as framed by the parties.

### E. Arbitrariness Challenges

As to Plaintiffs' arbitrariness challenges, *arbitrary* is defined in the Administrative Procedures Act (APA), 3 V.S.A. §§ 800–848, as follows:

"Arbitrary," when applied to an agency rule or action, means that one or more of the following apply:

(i) There is no factual basis for the decision made by the agency.

(ii) The decision made by the agency is not rationally connected to the factual basis asserted for the decision.

(iii) The decision made by the agency would not make sense to a reasonable person.

3 V.S.A. § 801(13)(a). Accordingly, as to arbitrariness challenges, the Court presumes that the Rule is valid, and the burden is on Plaintiffs to establish one of the cited arbitrariness grounds.

III.   Analysis

A.   The "control" of dogs (Act 165)

Plaintiffs challenge the definition of "control" of dogs and related requirements as both contrary to legislative intent and arbitrary. LCAR objected as to legislative intent, switching the burden on that issue to the State. As to arbitrariness, the Court presumes the validity of the Rule, and the burden of proving one of the arbitrariness grounds under 3 V.S.A. § 801(13)(a) is on Plaintiffs.

The principal focus of Plaintiffs' motion for preliminary injunction was that the definition and related control requirements do not conform to legislative intent. The Court addressed that matter in detail in Part II(c) of the resulting decision, ultimately concluding that "the Board is likely to satisfy its ultimate burden of proving that the Rule complies with legislative intent." Opinion and Order on Plaintiffs' Motion for Preliminary Injunction at 18 (filed Feb. 22, 2024), available at 2024 WL 1492588. Further briefing and record analysis has given the Court no cause to revise the analysis in that ruling. Accordingly, the Court adopts that part of the preliminary injunction decision for present purposes and concludes that the State has satisfied its burden of proving that the definition of control in the Rule is consistent with the intent of Act 165.

Because Plaintiffs focus so intently on the word "minimize" in 2021, No. 165 (Adj. Sess.), § 3(b), however, the Court will briefly expound further on its interpretation of that word. Act 165 has two overarching purposes, both of which are expressly set forth by the Legislature:

> The General Assembly through the rules required under this section intends
> to reduce conflicts between landowners and persons pursuing coyote with
> the aid of dogs by reducing the frequency that dogs or persons pursuing

coyote enter onto land that is posted against hunting or land where pursuit of coyote with dogs is not authorized. In addition, the General Assembly intends that the rules required under this section support the humane taking of coyote, the management of the population in concert with sound ecological principles, and the development of reasonable and effective means of control.

2021, No. 165 (Adj. Sess.), § 3(a). That is, to reduce conflict while keeping the hunting activity viable. As detailed at length in the preliminary injunction decision, the rest of Act 165 plainly addresses both risk reduction and hunting maintenance. Where Act 165 instructs the Board to come up with a definition of "control," however, it says that the definition should be designed to "minimize" the risks of trespassing, harassing or harming people or domestic animals, or causing "other unintentional damages to people or property." 2021, No. 165 (Adj. Sess.), § 3(a).

Plaintiffs seize on the different words—reduce v. minimize—and argue that minimize must mean not just to reduce but to reduce *as much as possible*. If that were literally so, then the Legislature curiously would have required the Board to merely reduce risks generally, but then tasked it with finding a way to reduce risks much more, and to do so exclusively by how a single word is defined. That single word, whose meaning is consistent with both side's views, cannot bear such weight.

Indeed, the Court rejected that contortionism in the preliminary injunction decision, and it adopts that analysis for present purposes. It is clear that the Legislature wanted the definition of control to contribute to the mission of reducing risks, and it plainly does, as one part of a network that also serves that mission in other ways.

Otherwise, Plaintiffs also argue that these provisions are arbitrary insofar as they fail to improve the status quo (largely as to GPS collars), will be ineffective, and do not include more or better restrictions on dog behavior.

Act 165, § 3(b)(4) required the Rule to include a definition of "control" that would "minimize" certain risks presented by dogs on coyote hunts. It required adoption of:

> a definition of control to minimize the risk that dogs pursuing coyote:
> (A) enter onto land that is posted against hunting;
> (B) enter onto land where pursuit of coyote with dogs is not authorized;
> (C) harass or harm people or domestic animals; and
> (D) cause other unintentional damages to people or property.

As the Court explained in the preliminary injunction decision, the Rule contains numerous provisions, many of which are new, that would minimize the risks of the listed undesirable interactions. The definition of "control" is but one mechanism for doing that.

The Rule defines "control" to mean: "that when transporting, loading, or unloading dogs from vehicle(s); and handling, catching, restraining, releasing, or following dogs *at all times* during training dogs and taking of coyote with the aid of dogs; the permittee shall be able to locate and remotely recall the dogs. Collar(s) with GPS functions, track log capability, and training/control features in the collar(s) shall be required to locate and track dogs at all times while taking coyote with the aid of dogs. At no time shall dogs be in pursuit of coyote without a GPS track log being maintained by the permit holder." Rule § 3.6 (emphasis added).

The Rule further provides:

(1) A person shall not take coyote with the aid of dogs unless the person is in control of the dog(s).

(2) No person shall take a coyote with the aid of dogs by using any Unregistered Dog. No person shall have an Unregistered Dog in their

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

possession (including in a vehicle) while hunting, pursuing, or taking a coyote.

(3) A person hunting with dogs, pursuing, and taking coyote with the aid of dogs shall attach a collar or collars with GPS functions, tracklog capability, and training/control features for remote recall; and shall attach a Department Registration Dog-Tag and a metal identification name plate with the person's name, address and telephone number to the dog's collar.

(4) A person taking a coyote with the aid of dogs shall maintain a GPS location log of each dog taking coyote and shall maintain the log for at least 30 days after the close of the season.

(5) A person taking a coyote with the aid of dogs shall only take a coyote with a Pack of Dogs as defined in this rule. No person shall pursue, hunt, or take coyote by Relaying any Dog or Pack of Dogs.

(6) Two or more permit holders may hunt together and combine Department Registered Dog(s) to form a Pack of Dogs. The combined Coyote Dog Permit holders shall not take coyote with the aid of more than four dogs combined forming a single pack of dogs. The combined Coyote Dog Permit holders shall not possess any Unregistered Dogs while hunting, pursuing, or taking coyote with the aid of their dogs.

Rule § 4.20(3)(d).

Plaintiffs' argument that the Rule merely codified the status quo, because hunters already used GPS devices on their dogs before the Rule, is overstated. At most, there is evidence that *most* such hunters used GPS units of some kind prior to the Rule. *See, e.g.*, FW 0008758 ("It is the Department's experience that most hunters who take coyote with the aid of dogs currently possess GPS units and control collars."); FW 0009182–83 (testimony from a wildlife biologist that GPS collars "have proven to be an indispensable tool and virtually all hunters owning hounds now use them and would not consider hunting without this technology"); FW 0013102 (memorandum from the Vermont Coyote Coexistence Coalition generally asserting that the Department's recommendations regarding the control of dogs "is what most coyote hounders are already doing"). Before

the Rule, however, there were no applicable regulations. Now *all* hunters *must* use GPS collars, those units must have specific capabilities, those capabilities will help ensure that hunters do not violate any restrictions imposed by the Rule, and there are significant penalties if violations occur. This was not remotely the status quo *ante*.

Plaintiffs additionally argue that the Rule could have included numerous provisions that would have reduced risks further, such as requiring hunters to keep dogs within their line of sight, and it could have subjected hunters to particular training and third-party certification requirements. Plaintiffs also point out that GPS units may not work in certain terrain, and some GPS units could be more effective than others.

These arguments arise largely out of Plaintiffs' view that Act 165 required the Board to reduce the risk of conflict "to the least quantity possible." As explained above, that interpretation of Act 165 is not reasonable. The Rule includes many provisions obviously intended to reduce the risk of conflict. That the Rule does not adopt every possible control provision and is not perfect from Plaintiffs' perspective, is insufficient to demonstrate arbitrariness.

Moreover, the Department takes the position that some such improvements—such as keeping dogs in the line of sight—would amount to a ban on hunting with dogs altogether. Department General Counsel Catherine Gjessing explained in a letter November 30, 2023, letter:

> The October 26, 2023, LCAR Memorandum asserts that the definition of control does not meet legislative intent and suggests that only leashes, voice control, or keeping hunting dogs within sight will do so. Hunting coyote with dogs entails chasing a coyote through fields and forests in locations where people cannot follow with a motorized vehicle or a horse. Requiring a hunter to maintain sight or voice distance from the dogs would

eliminate any possibility of a successful hunt. In other words, these requirements would be a de facto ban on hunting with dogs.

The plain language of Act 165 does not require the rules to eliminate risk and it does not require that the Board fashion rules that mandate that hunting dogs must be within sight or voice distance or on a leash. Hunting coyotes with dogs is currently unregulated in Vermont. The rules impose significant new requirements for this low-risk activity that are not applicable to other forms of hunting with dogs. In addition, the failure to follow any of the new requirements will be a violation of the rules, subject to penalties.

FW 0016798; *see also* FW 0017301 (prepared remarks by Will Staats noting extreme difficulty in attempting to run after dogs in pre-GPS days).

The overarching intent of Act 165 is to balance the need for regulation with the desire to keep the practice viable, not to regulate it into oblivion. Had the Legislature wished to ban such hunting it could have done so. It did not. If the Legislature wanted to add specific requirements such as those advocated by Plaintiffs, it could have done so as well. Instead, it delegated substantial rulemaking discretion to the Board to weigh and balance such concerns.

Finally, Plaintiffs point to little in the record to establish that conflicts with dogs on coyote hunts—other than a small handful of isolated incidents—has been any kind of widespread or recurrent problem in the past that would require the Board to provide an extraordinary remedy now. *See, e.g.*, FW 0009182 (letter from Will Staats: "The author [of a competing letter] continues to cite the two isolated incidents that occurred several years ago in Central Vermont. These incidents, while unfortunate and traumatic for all involved, are far from the norm and represent a tiny fraction of the thousands of hunts that occur each year. No one was bitten, however, and . . . both instances involved an

altercation between a domestic dog and the hounds. In 40 years of working with hunting dogs these two episodes are the only instances in Vermont I have ever heard of!").

Plaintiffs have failed to establish that the Rule is arbitrary on this issue.

B.      The definition of "public trail" (Act 159)

Act 159 required the Department's recommendations to include "requirements for the location of traps, including the placing of traps for purposes other than nuisance trapping at a safe distance, from public trails, class 4 roads, playgrounds, parks, and other public locations where persons may reasonably be expected to recreate." 2021, No. 159 (Adj. Sess.), § 1(a)(4). Act 159 does not define "public trails." The Rule provides, in relevant part:

> No foothold traps or body-gripping traps shall be set on or within 50′ of the travelled portion of a legal trail, public trail or public highway, unless set in the water or under ice. Setbacks shall not apply to public trails on Wildlife Management Areas except those public trails the Department specifically designates as requiring a setback. The Department shall post signage on Wildlife Management Areas advising the public of hunting seasons and locations where setbacks apply.

Rule § 4.15(a). "Public trail" is defined as follows:

> a) a path or corridor open to the public, used for nonmotorized recreational purposes such as hiking, walking, bicycling, cross-country skiing, horseback riding, and other similar activities; that is designated and mapped by a municipality on municipal lands, the managing agency or department on Vermont state owned land, or a federal agency on federal land; within the state of Vermont;
>
> b) a path or corridor open to the public, commonly used for nonmotorized recreation purposes such as hiking, walking, bicycling, cross-country skiing, horseback riding, and other similar activities; that is designated, managed, maintained and clearly marked as a trail on municipal lands, on Vermont state-owned land, or on federal land, within the state of Vermont; or
>
> c) Vermont Rail Trails designated and mapped by the Vermont Agency of Transportation, the Appalachian Trail designated, mapped and managed by

the National Park Service, and the Long Trail designated, mapped and managed by the Green Mountain Club.

Plaintiffs object that this definition does not extend to trails on private property or to trails on public property that are not "maintained and clearly marked." They argue that Act 159 does not authorize these carve-outs. Instead, they assert that § 1(a)(4) of Act 159 reflects the intent to extend its requirements to trails of any kind, no matter whether marked, maintained, or on private property, so long as members of the public might reasonably be expected to be there.

LCAR objected as to legislative intent, switching the burden on that issue to the State. Again, however, the proper question of intent is whether the Rule is as stringent as the Department's recommendations, and Plaintiffs do not contest the Rule on that basis. As explained above, the Court treats the absence of such an objection as a concession that the Rule is valid on this issue. As to arbitrariness, the Court presumes the validity of the Rule, and the burden of proving one of the arbitrariness bases under 3 V.S.A. § 801(13)(a) is on Plaintiffs.

The Court nevertheless addresses in the alternative the substance of the Legislative intent question as framed by the parties. Section 1(a)(4) of Act 159 does not, by its plain terms, include within its reach "all trails of any kind," as advocated by Plaintiffs. It refers generally to "public trails" and includes them as one of several "public locations." Act 159 easily could have but does not define "public trails." The need for the Rule to do so was manifest. Trappers and others need some cogent way to clearly identify where the setback applies. *See* FW 0016800 (Letter from Department General Counsel Catherine Gjessing to LCAR members, explaining the need for the definition to

be "easily understandable" or else it would be "largely unenforceable"). "Public trails," on its own, is vague. That statutory vagueness left considerable room for clarification in the Rule. Generally speaking, the expression *public location* may be reasonably understood to exclude private locations, and *public trails* similarly may be reasonably understood to exclude private trails. The definition is not inconsistent with the intent reflected in the language of the law.

As to arbitrariness, Plaintiffs argue that Vermonters have the expectation that private land is open to the public, and State law encourages that; thus, the limitations make no sense. *See, e.g.,* 10 V.S.A. § 5201 (posting vis-à-vis taking game on private land), 12 V.S.A. §§ 5791–5795 (limitation on landowner liability). The State's retort is that regulating privately owned land in the manner advocated by Plaintiffs might induce such landowners to stop permitting members of the public to recreate on their land. This is not an unreasonable or untenable position. It is further supported in the record by the need for all concerned to have clarity as to which trails are covered by the Rule and which are not.

Plaintiffs do not like how public trails are defined in the Rule, but the State has demonstrated that the definition is not contrary to the intent of the Legislature, and Plaintiffs have not shown that the definition is arbitrary.

C. Traps in water or under ice (Act 159)

In the Rule, traps "set in the water or under ice" are entirely exempt from both the 50 and 100-foot setbacks. Rule § 4.15(a), (b). Rule § 4.4 further provides that: "All traps under ice will be marked with a tag visible above the ice." Act 159, § 1(a)(4) requires traps to be set at a "safe distance" from regulated locations. Plaintiffs argue that a zero

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

distance cannot possibly be a safe distance within the meaning of Act 159. They also argue that this exemption is arbitrary in that it makes no sense because recreating people and pets are attracted to streams and other water bodies.

LCAR objected as to legislative intent, switching the burden on that issue to the State. However, the proper question of intent is whether the Rule is as stringent as the Department's recommendations, and Plaintiffs do not contest the Rule on that basis. As explained above, the Court treats the absence of such an objection as a concession that the Rule is valid on this issue as to legislative intent. As to arbitrariness, the Court presumes the validity of the Rule, and the burden of providing one of the arbitrariness bases under 3 V.S.A. § 801(13)(a) is on Plaintiffs. In the alternative, the Court will also address the merits as presented.

While Plaintiffs' argument as to the lack of set-backs has superficial appeal, the Board has persuasively countered that there is no evidence that trapping presents any real risk to humans, as there has never been a "report of a member of the public trapped or harmed by a trap." FW 0016542. The Board also reports that the best information available to it is that there have only been 2 incidents of dogs being injured by traps in the water, and both were nuisance trapping situations that occurred outside the aquatic trapping season. FW 0016802. The aquatic trapping season is the end of October through the end of March, when "[m]any public camps, campgrounds, and parks are closed," FW 0016542, and the water is cold or frozen over, FW 0016802. During this time, aquatic traps are impossible or hard to access (under ice) or in highly undesirable places for people and pets (very cold water). The record history and circumstances, therefore, support the view that the exemption from the setback is safe within the

meaning of Act 159 and not arbitrary. *See* FW0016556 (trapping statistics documenting consistently low number of incidents); FW0016802 (of which only 2 involved traps in water, and both were nuisance trapping situations occurring outside the regular season).

Plaintiffs further assert that the statistics available to the Board as to harm to members of the public or their pets is limited and that any reliance on water temperature or ice historically does not account for changing temperatures caused by global warming. Plaintiffs point to nothing in the record, however, to the effect that better statistical evidence was available to the Board and it ignored that better evidence, or that global warming has caused a shift in water temperature and ice formation to the extent that the Board's reliance on ordinary expectations about seasonal conditions have changed so much as to reveal the Rule as arbitrary.

The State has satisfied its burden of showing that the setback exemption is consistent with legislative intent. Plaintiffs have failed to show that it is arbitrary.

###### D.     The definition of trapping (Act 159)

Act 159, § 1(d) provides: "As used in this section, 'trapping' means to take or attempt to take furbearing animals with traps, including the dispatching of lawfully trapped furbearing animals." Trapping is not otherwise statutorily defined. Rule § 3.20 defines trapping as follows: "'Trapping' means to hunt, take or attempt to take fur-bearing animals with traps including the dispatching of such lawfully trapping fur-bearing animals." Take or taking is statutorily defined as follows: "Take and taking: pursuing, shooting, *hunting*, killing, capturing, *trapping*, snaring, and netting fish, birds, and quadrupeds and all lesser acts, such as disturbing, harrying, worrying, or wounding or placing, setting, drawing, or using any net or other device commonly used to take fish

or wild animals, whether they result in the taking or not; and shall include every attempt to take and every act of assistance to every other person in taking or attempting to take fish or wild animals, provided that when taking is allowed by law, reference is had to taking by lawful means and in a lawful manner." 10 V.S.A. § 4001(23).

Plaintiffs principally argue that the definition of trapping in the Rule is contrary to the intent of the Legislature as demonstrated by the different definition of trapping in Act 159. They also argue that there simply is no delegation of rulemaking authority in Act 159 empowering the Board to adopt any definition of trapping at all, which is completely unnecessary to the Rule. Finally, for the first time in their reply brief and without any citation to the record, Plaintiffs assert: "Notably, the proposed change in the definition was never placed on any rulemaking agenda, was not in any agency summary of the proposed rule, and no public comment was taken about the change by the agency directly. The entire process lacked the level of transparency critical to the democratic process."

The State argues that Plaintiffs lack standing to challenge the definition of trapping in the Rule as they have identified no nonspeculative injury caused or threatened by it. It also argues that the definition is not contrary to legislative intent and facilitates the mandate to modernize and clarify Vermont's trapping regulations.

On the standing question, Plaintiffs have the burden of proof. *See Brod v. Agency of Nat. Res.*, 2007 VT 87, ¶ 9, 182 Vt. 234, 239. As to the issue of legislative intent, LCAR objected as to that point, switching the burden on that matter to the State. As noted above, however, the proper question of intent is whether the Rule is as stringent as the Department's recommendations, and Plaintiffs do not contest the Rule on that basis.

24-CV-00189 Protect Our Wildlife, a nonprofit 501(c)(3) organization et al v. Fish and Wildlife Board, an Agency of the State of Vermont et al

The Court treats the absence of such an objection as a concession that the Rule is valid on this issue as to legislative intent. As to arbitrariness, the Court presumes the validity of the Rule, and the burden of proving one of the arbitrariness bases under 3 V.S.A. § 801(13)(a) is on Plaintiffs. With those standards in mind, the Court will analyze the claim regarding the definition of trapping.

"Standing doctrine is fundamentally rooted in respect for the separation of powers of the independent branches of government." *Hinesburg Sand & Gravel Co. v. State*, 166 Vt. 337, 341 (1997) (noting at 340–41 that "[o]ne of the 'passive virtues' of the standing doctrine is to promote judicial restraint by limiting the occasions for judicial intervention into the political process"). Standing "confin[es] the judiciary to the adjudication of actual disputes and prevent[s] the judiciary from presiding over broad-based policy questions that are properly resolved in the legislative arena." *Parker v. Town of Milton*, 169 Vt. 74, 77 (1998).

The contemporary federal doctrine was described in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), as follows:

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id*. at 560–61 (citations omitted). These are the constitutional (as opposed to prudential) limits on federal courts' jurisdiction.

The federal standing requirements have been adopted in Vermont. *Parker*, 169 Vt. at 77–78 (explaining that in *Hinesburg Sand & Gravel*, the Vermont Supreme Court adopted the standing test articulated in *Lujan*). Vermont courts are not, however, inflexibly bound by federal standing precedents insofar as standing in Vermont state court presents a legal question under the Vermont, rather than United States, constitution. *See Ferry v. City of Montpelier*, 2023 VT 4, ¶ 15, 217 Vt. 450, 461–62.

Plaintiffs argue that they only need to show standing in relation to the form of relief sought rather than in relation to each claim asserted. They also assert that some nonspeculative injury can be located in the risk that there could be unspecified constitutional repercussions sometime in the future to the new definition of trapping.

Plaintiffs are correct that they must have standing for each form of relief sought. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). They also must have standing as to each claim asserted, however. *See DaimlerChrysler Corp. v. Duno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim [it] seeks to press."). Plaintiffs have the burden of demonstrating constitutional standing regarding their challenge to the definition of trapping.

Apart from constitutional standing, they also are statutorily required, as a condition to bringing this claim, to demonstrate that "the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff." 3 V.S.A. § 807.

The principal issue is whether there is any ascertainable injury. Plaintiffs cite to the Vermont Constitution, which provides: "The inhabitants of this State shall have liberty in seasonable times, to hunt and fowl on the lands they hold, and on other lands

not inclosed, and in like manner to fish in all boatable and other waters (not private property) under proper regulations, to be made and provided by the General Assembly." Vt. Const. ch. II, § 67. Section 67, on its face, does not indicate the breadth of the expression *hunting*. Plaintiffs apparently fear that the definition of trapping in the Rule could have some impact on whether trapping is considered hunting within the meaning of § 67, at least at some point in the future and, if so, that might lead to some determination that the right to trap is coextensive with the constitutional right to hunt. Plaintiffs presumably believe that the right to trap should be more limited than the right to hunt in some manner. They profess, in challenging this provision of the Rule, to be playing "the long game."

The Court fails to see any present, actual, and cognizable injury in Plaintiffs' long-term apprehension. First, the Vermont Supreme Court may well have already indicated that trapping is a category of hunting for constitutional purposes. *See Hunters, Anglers & Trappers Ass'n of Vermont, Inc. v. Winooski Valley Park Dist.*, 2006 VT 82, ¶ 6, 181 Vt. 12, 16 ("Section 67 vests the Legislature with the power to regulate hunting and trapping even on privately held lands, and we have previously held that the Legislature may delegate this power to some other 'body or person.'"). Moreover, as stated in that case, the right in § 67 is subject to the Legislature's power to regulate, as trapping would be if it were not considered to be a form of hunting. It is therefore wholly unclear what injury Plaintiffs could possibly suffer based on trapping's status as hunting for § 67 purposes. Second, ignoring that case, future construction of a constitutional term is not controlled by an agency's action. Ultimately, the judiciary is responsible for interpreting the Constitution, something the Board cannot undermine by dint of the definition of a word

in a rule. At a minimum, the idea that there is some kind of definitional "long game" underway here between trapping adversaries is purely speculative.

Plaintiffs lack standing to challenge this portion of the Rule for lack of any identified injury. Though that is sufficient to dispose of this claim, it bears noting that the definition in the Rule *is* consistent with the definition in Act 159 and 10 V.S.A. § 4001(23). Act 159 merely classifies trapping as a form of taking. Under 10 V.S.A. § 4001(23), both hunting and trapping already were forms of taking. Classifying trapping further as a form of hunting leaves both pursuits takings, which is not contrary to 10 V.S.A. § 4001(23) or Act 159.

Plaintiffs' argument that there is a wholesale lack of rulemaking authority to adopt a definition of trapping also is unfounded. Act 159 broadly directs the Board to revise its trapping rules. The only constraint on that authority is that BMPs in the new Rule must be at least as stringent as those recommended by the Department. Plaintiffs point to no way in which the definition of trapping in the Rule somehow deviates from that constraint. Beyond Act 159, the Board has expansive rulemaking authority to adopt fish and wildlife regulations. 10 V.S.A. § 4082. Plaintiffs do not explain in any cogent way how the definition of trapping in the Rule somehow falls outside these broad delegations of authority. Certainly nothing in Act 159 bars the Board from addressing the definition of trapping in the Rule.

Nor is the definition arbitrary in any palpable sense. Although the record provides scant support for the asserted *need* for such a definition, the Rule reflects the Board's view of the matter, is not inconsistent with Vermont law in any identified way, is not

irrational, and the Court presumes that it is correct, valid, and reasonable. That is sufficient to survive an arbitrariness challenge.

Finally, to the extent that Plaintiffs have challenged the process by which the Board adopted the definition of trapping, that argument was first raised in their reply brief and is not supported by any citations to the record. Arguments first raised in a reply brief are not properly presented. *See In re Wal-Mart Stores, Inc.*, 167 Vt. 75, 86 (1997). Moreover, the State's representations in the record appear to squarely contradict Plaintiffs' representations:

> The definition of trapping in section 3.20 of the rule was in the draft rule prior to filing the rule with the Secretary of State, months before the Board voted on the final rule for filing with LCAR. The draft rule with the definition was first voted on by the Board on April 5, 2023. It was posted on the Board section of the Department website before the Board's first vote, prior to the filing with the Interagency Committee on Administrative Rules. This language remained in the draft rule, was posted on the website, and was readily available to the public, before the public comment period and the public hearings related to the rule. No one commented on the definition until after the public comment period when Ms. Galdenzi of Protect Our Wildlife inquired about the change on August 30, 2023, and subsequently asserted on September 1, 2023 that "trapping is not a form of hunting."

FW 008988. The Court declines to address this matter further.

Plaintiffs lack standing to bring a challenge to the Rule's definition of trapping. Even if they had standing, they failed to properly object that the definition is not as stringent as the Department's recommendations. Moreover, the State has demonstrated that the definition is not inconsistent with the legislative intent of Section 1 of Act 159, and Plaintiffs have failed to demonstrate that it is arbitrary or otherwise outside the rulemaking authority of the Board.

E.    Body-gripping traps (Act 159)

Plaintiffs take issue with the best management practices (BMPs) in the Rule regarding body-gripping traps. They argue that there is insufficient evidence that the BMPs related to body-gripping traps meet the Association of Fish and Wildlife Agencies (AFWA) performance standard, the AFWA has not seriously studied body-gripping traps, the AFWA has not produced any species-trap-specific data, and the Board should have considered banning or limiting the use of body-gripping traps altogether.

LCAR did not object to the Rule for any reason related to body-gripping traps. Therefore, the Court presumes that the challenged provisions are correct, valid, and reasonable. Plaintiffs have the burden to prove the contrary.

To the extent that Plaintiffs take issue with the AFWA BMPs used by the Department in crafting recommended BMPs, *the Legislature expressly required that result.* "The BMPs shall be based on investigation and research conducted by scientists and experts at the Department of Fish and Wildlife and shall use the 'Best Management Practices for Trapping in the United States' issued by the Association of Fish and Wildlife Agencies as the minimum standards for BMP development." 2021, No. 159 (Adj. Sess.), § 1(a).

To the extent that Plaintiffs' position is that AFWA's BMPs do not meet its own "performance standard" in the case of body-gripping traps, at least for some species, and so the Department should have limited or banned them, the argument is insufficient to demonstrate arbitrariness. Again, the Legislature required the use of the AFWA BMPs. Plaintiffs' dissatisfaction with those BMPs, or their belief that those BMPs do not have

an adequate evidentiary basis, does not demonstrate that reliance on those standards is irrational or nonsensical to a reasonable person.

To the extent that Plaintiffs argue that the BMPs in the Rule may be arbitrary because the data upon which the AFWA BMPs rely are not publicly available, the Court reiterates that the Legislature required the Department to use the AFWA's BMPs as a starting point for its own BMPs. *See* FW 0012872 (e-mail from Bryant White explaining the proprietary nature of the underlying data). Plaintiffs can hardly fault the Department for doing what the Legislature plainly required of it.

Plaintiffs also object that the AFWA BMPs are species-specific while the Rule's BMPs are not. The point is accurate. On the other hand, the Rule is presumptively valid, and Plaintiffs bear the burden of showing its invalidity. Here, the explanation for not incorporating species-specific standards is in the record is as follows:

> While the proposed rules do not set forth species specific BMPs, there is empirical scientific evidence that the recommendations will address animal welfare and selectivity. For example, swivels, limited chain length, and adjustable pan tension will improve the mobility and selectivity of trapped animals and will reduce injuries. Similarly, padded, offset, or laminated trap jaws will limit injury to trapped animals. The jaw measurements, including padding, are all within BMP recommendations for all species trapped in Vermont.

> The proposed rules are not designed to address each species independently from one another, because such rules would be overly complicated and would require law enforcement to determine what species a trapper intended to target. The BMPs imbedded in the rule are specific and enforceable.

FW 0016238–39; *see also* FW 0004389 (comment of Kevin French advocating position "to make [BMPs] realistic for trappers to adhere to them"); FW 0005425 (comment of

Madeline Cowan advocating position that would serve the interest in keeping the BMPs "straightforward for trappers to understand and for wardens to enforce").

Plaintiffs spend little, if any, time arguing that the failure to adopt any of the species-specific requirements somehow works to the detriment of any person or species. Nor do they counter the State's evidence establishing its consideration of species-specific regulations, and the reasons why it rejected those in favor of a clear standard applicable to all. Those considerations, supported by the record, are not irrational or manifestly unreasonable. Indeed, just the opposite. They fully support the Board's decision to have a more generic standard that more easily may be understood and enforced.

## Conclusion

For the foregoing reasons, the Court affirms the validity of the Rule.

Electronically Signed on March 25, 2025, per V.R.E.F. 9(d)

Timothy B. Tomasi
Superior Court Judge